**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JOHN D'URSO, *et al.*,

                Plaintiffs,

       v.

BAMCO, INC., *et al.*,

                Defendants.

Civil Action No. 22-03723 (GC) (RLS)

**OPINION**

**CASTNER, District Judge**

This matter comes before the Court upon the Motion to Dismiss filed by Defendants BAMCO, Inc., Baron Capital, Inc., Baron Capital Management, Inc., and Baron Capital Group, Inc., pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  (ECF No. 17.)  Plaintiffs John D'Urso, Jean D'Urso, Christopher D'Urso, Robert D'Urso, Ada D'Urso, and Riccardo D'Urso opposed (ECF No. 26), and Defendants replied (ECF No. 27).  The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Defendants' Motion to Dismiss is **GRANTED**.

## I.   <u>BACKGROUND</u>[1]

Plaintiffs are non-professional individual traders and citizens of New Jersey.  (ECF No. 1 ¶ 8.)  Defendants are New York investment entities responsible for the management of various mutual funds ("Baron Funds").  (*Id.* ¶¶ 10-13.)  This case arises from Plaintiffs' investments in the Baron Funds and Defendants' enforcement of a frequent trading policy against Plaintiffs.

Defendants' mutual fund prospectus sets forth a frequent trading policy ("Frequent Trading Policy") that states, in relevant part, the following:[2]

> **Trades in and out of a Fund within 90 days or less may be indicative of frequent trading.**  If [Defendant] believes that an investor is a frequent trader, [Defendant], in its sole discretion, may temporarily or permanently bar that investor from trading in the Fund or any Baron Funds®.  *Exchanges between the Funds within 90 days or less will generally not be considered frequent trading, unless [Defendant], in its sole discretion, determines that such exchanges are excessive.*  Although [Defendant] uses a variety of methods to detect and deter frequent trading, there is no assurance that [Defendant's] own operational systems and procedures will identify and eliminate all frequent trading strategies.
>
> . . .
>
> The Funds' policies and procedures may be modified or terminated at any time.  *The Funds reserve the right to reject any purchase or exchange request for any reason.*  [Defendant], in its sole discretion, may waive its policies regarding frequent purchases and redemptions of Fund shares for purchases, redemptions and exchanges that are part of a rebalancing or asset allocation program administered by an approved financial intermediary.

---

[1]   For the purposes of this Motion to Dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [Plaintiffs]."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (citing *Worldcom, Inc. v. Graphnet, Inc*., 343 F.3d 651, 653 (3d Cir. 2003)).

[2]   The Court also takes judicial notice of the Baron Funds prospectus filed with the SEC because such regulatory filings are "matters of public record" and because they are "*integral to or explicitly relied upon* in the complaint."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  A copy of the prospectus dated January 28, 2019, is also exhibited to Defendants' briefing in support of the instant motion.  (*See* ECF No. 17-2 at 17-177; *see also* ECF No. 17-1 at 16-17.)

[(*See* ECF No. 1 ¶ 28; ECF No. 17-2 at 95-96 (emphasis added).[3])]

At all times acting through a broker, Plaintiffs first purchased shares of the Baron Funds in September 2019.  (ECF No. 1 ¶ 19.)  As of January 2020, Plaintiffs owned shares of six different Baron Funds, which were held of record by Pershing LLC ("Pershing").  (*Id.* ¶¶ 20, 21.)  On February 25, 2020, amid the COVID-19 pandemic-fueled market crash, Plaintiffs liquidated all of their holdings in the Baron Funds.  (*Id.* ¶¶ 22-23.)

In March 2020, Plaintiffs' broker received several emails from Defendants advising investors that it was "a great time to invest," despite the ongoing COVID-19 pandemic.  (*Id.* ¶¶ 25-26.)  Before reinvesting in the Baron Funds, Plaintiffs instructed their broker to confirm with Defendants that they could reinvest without issue given the Frequent Trading Policy contained within the prospectus.  (*Id.* ¶ 27.)  In communications between Plaintiffs' broker and William Zorovich, Vice President, Regional Director, and External Wholesaler for Defendants, Zorovich stated that Plaintiffs would be allowed to trade in the Baron Funds because Plaintiffs had a legitimate rationale behind the short-term trading — to mitigate losses triggered by the COVID-19 market volatility.  (*Id.* ¶ 42.)

On March 26, 2020, Plaintiffs repurchased shares of one of the Baron Funds.  (*Id.* ¶ 44.)  Seven days later, on April 1, 2020, Plaintiffs fully liquidated and closed out their positions.  (*Id.*)  Later in April 2020, Plaintiffs repurchased their shares of the Baron Funds.  (*Id.* ¶¶ 45-46.)  After these April 2020 purchases, Zorovich called Plaintiffs' broker to praise him for Plaintiffs' "great trade."  (*Id.* ¶ 47.)  On June 11, 2020, Plaintiffs again fully liquidated and closed out their positions in the Baron Funds.  (*Id.* ¶ 49.)  A day later, on June 12, 2020, Plaintiffs instructed their broker to

---

[3]   Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

repurchase the same positions they had previously held the day before in the Baron Funds ("June 12 Trades"). (*Id.* ¶ 50.)

On June 15, 2020, Plaintiffs received trade confirmations for the June 12 Trades from Plaintiffs' broker, Pershing. (*Id.* ¶ 53.)[4] Later that day, Zorovich verbally informed Plaintiffs and Plaintiffs' broker that "Plaintiffs' trades at the close of June 12, 2020, would be 'reversed' for violating Baron's frequent trading policy" and that Plaintiffs and their broker were "permanently banned" from trading in the Baron Funds. (*Id.* ¶ 54.) Thereafter, Defendants "reversed" the June 12 Trades on June 24, July 1, July 2, and July 6, 2020, based on the price Plaintiffs paid to purchase the shares on June 12, 2020. (*Id.* ¶¶ 59, 62.)

On June 10, 2022, Plaintiffs initiated this action against Defendants.[5] The Complaint includes the following ten state-law causes of action: (1) breach of contract (Count One); (2) breach of implied duty of good faith and fair dealing (Count Two); (3) tortious interference with contract (Count Three); (4) conversion (Count Four); (5) trespass to chattels (Count Five); (6) negligent misrepresentation (Count Six); (7) equitable estoppel (Count Seven); (8) unjust enrichment (Count Eight); (9) declaratory judgment (Count Nine); and (10) spoliation (Count Ten). Defendants' motion to dismiss followed.

## II.   **LEGAL STANDARD**

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable

---

[4]   Plaintiffs also allege that "Baron later altered trade records in an attempt to show that the trades had not settled." (ECF No. 1 ¶ 57.)

[5]   Subject-matter jurisdiction is based on 28 U.S.C. § 1332(a)(1). The parties seem to agree that New Jersey law applies in this diversity action. Having not been directed to a conflict of potentially applicable laws, the Court applies principles of New Jersey law.

reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quotations and citations omitted).  Although Rule 8(a) does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips*, 515 F.3d at 234. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard under *Twombly* and *Iqbal*, courts within this Circuit apply a three-step test.  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).  Next, the court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id.*  Finally, where "there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.   <u>DISCUSSION</u>

Defendants argue that the Complaint fails to state a claim as to each of the ten counts.[6]  The Court addresses each claim below.

---

[6]    Defendants argue that all claims against Defendants Baron Capital Management, Inc. ("BCM") and Baron Capital Group, Inc. ("BCG") should be dismissed because the Complaint fails

A.    BREACH OF CONTRACT (COUNT ONE)

Plaintiffs assert breach of an alleged contract between the parties "for the purchase and sale of securities." (ECF No. 1 ¶¶ 66-71.)

To state a claim for breach of contract, a plaintiff must plead (1) the existence of a valid contract, (2) that plaintiff performed under the contract, (3) the defendant's breach of the contract, and (4) damages resulting from the breach. *Pollack v. Quick Quality Restaurants, Inc.*, 172 A.3d 568, 576 (N.J. Super. Ct. App. Div. 2017). "[F]or a valid contract to exist, the plaintiff must show mutual assent, consideration, legality of the object of the contract, capacity of the parties, and formulation of memorialization." *Vukovich v. Haifa, Inc*., Civ. No. 03-737, 2007 WL 655597, at *4 (D.N.J. Feb. 27, 2007) (citing *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 421 F. Supp. 2d 831, 833 (D.N.J. 2006)).

Here, the Complaint alleges that Plaintiffs were parties to, or third-party beneficiaries of, a contract with Defendants for the purchase and sale of securities. (ECF No. 1 ¶¶ 67-68.) Under that alleged contract, Plaintiffs had a right to the securities they purchased on June 12, 2020, once Plaintiffs' trades settled. (*Id.* ¶ 68.) Plaintiffs contend that Defendants breached the contract when they "reverse[d] and redeem[ed] settled and/or then failed to pay Plaintiffs" for the shares they

---

to assert any specific allegations against those entities. (ECF No. 17-1 at 37-39.) The Court agrees. A complaint must "specify which defendants performed which acts." *Zuniga v. Am. Home Mortg.*, Civ. No. 14-2973, 2016 WL 886214, at *2 (D.N.J. Mar. 7, 2016). Yet here, the Complaint fails to distinguish between the different defendant entities and, instead, refers to all four defendant entities collectively as "Baron" or "Defendants." (*See, e.g.*, ECF No. 1 ¶ 60 (alleging "*Baron* . . . unlawfully reversed Plaintiffs' settled trades" and "*Defendants* caused Plaintiffs damages") (emphasis added).) Indeed, the only specific allegations as to BCM and BCG are in the section of the Complaint detailing the parties in this action. (*See id.* ¶¶ 12-13.) Plaintiffs' inclusion of BCM and BCG thus constitutes an impermissible group pleading. *See United States ex rel. Bennett v. Bayer Corp.*, Civ. No. 17-4188, 2022 WL 970219, at *7 (D.N.J. Mar. 31, 2022) (finding allegations that fail to distinguish between distinct defendant entities amount to impermissible group pleading). Accordingly, BCM and BCG are dismissed as defendants.

6

purchased on June 12, 2020.  (*Id.* ¶ 69.)  As a result of the breach, the Complaint alleges, Plaintiffs suffered $1.5 million in damages.  (*Id.* ¶ 71.)

Defendants argue, among other things, that Plaintiffs have not cited to the provision of the alleged contract that was breached.  (ECF No. 17-1 at 24.)  The Court agrees.  The claim fails to identify key specifics of the purported contract — for example, specific contractual provisions that Defendants' actions allegedly breached and how Defendants' conduct violated those provisions.  Such allegations are necessary for Plaintiffs to sustain a breach-of-contract claim.  *See DeHart v. U.S. Bank, N.A. ND*, 811 F. Supp. 2d 1038, 1048 (D.N.J. 2011) (finding plaintiffs had not stated a claim where they failed to identify what contract provision was breached); *GKE Ents., LLC v. Ford Motor Credit Co.*, Civ. No. 09-4656, 2010 WL 2179094, at *3 (D.N.J. May 26, 2010) (dismissing breach-of-contract claim where the "Complaint neither alleges which provision of the contract Defendant breached, nor how Defendant breached it").  For that reason alone, Plaintiffs' breach-of-contract claim fails.

Defendants also contest that the Baron Funds' prospectus is a governing contract between the parties or that Defendants violated the provision of the prospectus containing the Frequent Trading Policy.  (ECF No. 17-1 at 21-23; *see* ECF No. 26 at 13.)  Even if there exists a binding contract based on the Frequent Trading Policy, Plaintiffs still failed to plausibly allege a breach.  The policy grants Defendant "sole discretion" to ban investors it believes are frequent traders.  (ECF No. 1 ¶ 28.)  The policy also states that trades in and out of a Baron Fund within 90 days or less may be indicative of frequent trading.  (*Id.*)  And the policy states that Defendants "reserve the right to reject any purchase . . . for any reason."  (*Id.*)  Consistent with the policy, the SEC has issued guidance and regulations encouraging mutual funds to deter an investment strategy commonly referred to as "market timing," which involves the frequent buying and selling of mutual fund shares to take advantage of short-term inefficiencies in pricing.  *See Prudential Ins.*

*Co. of Am. v. Prusky*, Civ. No. 04-0462, 2008 WL 859217, at *3 (E.D. Pa. Mar. 31, 2008); *see also* Proposed Rule: Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70402, 70403-40704 (Dec. 17, 2003) ("SEC Market Timing Release"); SEC Rule 22c-2, 17 C.F.R. § 270.22c-2 (expressly requiring mutual funds to take steps to protect their shareholders from potential harm caused by market timing).[7]

Defendants' actions, as alleged in the Complaint, appear to accord with that policy. After closing out of their positions at the onset of COVID-19, Plaintiffs traded in and out of the Baron Funds at least five times from March to June 2020. (ECF No. 1 ¶¶ 44-50.) Upon the fifth time, Defendants banned Plaintiffs from future trading and rejected their last trade on June 12, 2020. (*Id.* ¶ 54.) Thus, even if the Frequent Trading Policy is an enforceable contract, Plaintiffs have failed to allege a breach of that policy. *See Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 14 (2d Cir. 2019) (affirming dismissal of shareholder action for breach of contract against mutual fund for failing to allege violation of policy included in prospectus where policy and SEC guidelines allowed fund's action).[8]

The Court therefore dismisses Plaintiffs' claim for breach of contract under Count One.

---

[7]    According to the SEC Market Timing Release, "many mutual funds have developed policies and procedures with respect to frequent purchases and redemptions of fund shares." 68 Fed. Reg. at 70404. It also acknowledges that many mutual funds have taken steps to discourage market timing — for instance, disclosing in prospectuses that market timing is not permitted and "[i]dentifying market timers and restricting their trading privileges or expelling them from the fund." *Id.*

[8]    Plaintiffs also assert in their brief, for the first time, the existence of an oral contract based on Defendants' telling Plaintiffs' broker that they would not violate the Frequent Trading Policy by repurchasing shares of the Baron Funds. (ECF No. 26 at 14.) The Court does not consider this assertion in deciding Defendants' motion, as plaintiffs may not amend their complaint through arguments in a brief. *Hall v. Revolt Media & TV, LLC*, Civ. No. 17-2217, 2018 WL 3201795, at *3 (D.N.J. 2018) (citing *Pennsylvania, ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)).

### B.   BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING (COUNT TWO)

Plaintiffs also allege that Defendants breached the implied duty of good faith and fair dealing by, among other things, "involuntarily redeeming the securities to which Plaintiffs had an entitlement for purportedly violating Baron's frequent-trading policy" after "inducing Plaintiffs to believe that [Defendants] would not invoke the frequent-trading policy against Plaintiffs."  (ECF No. 1 ¶ 75.)

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001) (citations omitted).  "Good faith conduct is conduct that does not 'violate community standards of decency, fairness or reasonableness.'"  *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (N.J. 2005) (quoting *Wilson*, 773 A.2d at 1126).  Although there are "myriad forms of conduct that may constitute violation of the covenant of good faith and fair dealing," and "[e]ach case is fact-sensitive," *id.* at 396, "[p]roof of 'bad motive or intention' is vital to an action for breach of the covenant," *id.* (quoting *Wilson*, 773 A.2d at 1130).

Here, the Complaint alleges that Defendants acted in bad faith by "inducing Plaintiffs to believe that [Defendants] would not invoke the frequent-trading policy against Plaintiffs . . . without specifying in the prospectuses that [Defendants] claimed the right to reverse settled trades for violation of the frequent-trading policy."  (ECF No. 1 ¶ 75.)  On these allegations, the Court finds that Plaintiffs have not alleged sufficient facts that show Defendants acted in bad faith, as required to establish a breach of the implied covenant of good faith and fair dealing.  Indeed, Zorovich's statements, even viewed in a light most favorable to Plaintiffs, do not give rise to an inference that Defendants acted with "bad motive or intention."  Allegations as to an act of bad faith on the part of Defendants are necessary to sustain a claim for breach of the covenant of good faith and fair dealing.  *See Kenny v. Search*, Civ. No. 15-0456, 2015 WL 4394241, at *4 (D.N.J.

July 15, 2015) (dismissing breach-of-covenant claim "because Plaintiff has failed to allege any facts that point to an act of bad faith on the part of Defendants").

Because Plaintiffs have not alleged any facts supporting a plausible inference that Defendants acted with bad faith, the Court dismisses Count Two.[9]

## C.   TORTIOUS INTERFERENCE WITH CONTRACT (COUNT THREE)

Count Three presents a claim for tortious interference with Plaintiffs' contracts with their brokers and securities intermediaries to purchase shares of the Baron Funds.  (ECF No. ¶¶ 77-81.) Plaintiffs allege that Defendants knew of these contracts and intentionally interfered with them such that Plaintiffs' brokers "removed the securities from Plaintiffs' accounts and credited Plaintiffs only with cash in the amount of the original purchases."  (*Id.* ¶ 81.)

To establish a *prima facie* claim for tortious interference with contract, Plaintiffs must show that (1) they were a party to an existing contractual relationship; (2) Defendants intentionally interfered with that contractual relationship; (3) the interference was undertaken with malice; and (4) Plaintiffs suffered damages resulting from the interference.  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1992); *Nostrame v. Santiago*, 61 A.3d 893, 901 (N.J. 2013).  "A

---

[9]    Plaintiffs' now-dismissed breach-of-covenant claim (Count Two) appears to be duplicative of their now-dismissed breach-of-contract claim (Count One).  "[A] plaintiff may not pursue a claim for a breach of the implied covenant of good faith and fair dealing if the claim is duplicative of the plaintiff's breach of contract claim."  *Cedar Holdings, LLC v. Menashe*, Civ. No. 16-7152, 2017 WL 1349321, at *3 (D.N.J. Apr. 7, 2017).  "A claim for breach of the implied covenant is duplicative of a breach of contract claim when allegations of bad faith all relate to actions that form the basis of the breach of contract claim."  *Id.* (citing *Intervet, Inc. v. Mileutis, Ltd.*, Civ. No. 15-1371, 2016 WL 740267, at *5 (D.N.J. Feb. 24, 2016)).  Here, Plaintiffs' allegations that Defendants acted in bad faith all relate to and arise from the allegations that establish the basis of Plaintiffs' breach-of-contract claim.  *See Valley Joist, LLC v. OEG Bldg. Materials, LLC*, Civ. No. 21-20374, 2023 WL 2238689, at *8 (D.N.J. Feb. 27, 2023).  As with the breach-of-contract claim, the basis for the breach-of-covenant claim is Defendants' involuntary redemption of the shares. (*Compare* ECF No. 1 ¶ 71 ("Baron breached the contract when it purported to reverse and redeem settled trades."), *with id.* ¶ 75 ("Baron breached that duty by . . . involuntarily redeeming the securities.").)  Additionally, Plaintiffs seek the same amount of damages for a breach of the covenant as for a breach of contract.  (*Compare* ECF No. 1 ¶ 65, *with id.* ¶ 76.)

claim for tortious interference with the performance of a contract must be based, in part, on facts claiming that the interference was done intentionally and with malice." *Micro Image Techs., Inc. v. Olympus Corp. of the Americas*, Civ. No. 20-18781, 2022 WL 17132156, at *4 (D.N.J. Nov. 22, 2022) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). Interference with a contract is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *Id.* (quoting Restatement (Second) Torts, § 766A, cmt. e (1977)). An actor acts with malice when "the harm was inflicted intentionally and without justification or excuse." *MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996) (quoting *Printing Mart-Morristown*, 563 A.2d at 37); *see also Cox v. Simon*, 651 A.2d 476, 483 (N.J. Super. Ct. App. Div. 1995). In determining the existence of malice, courts analyze "whether the conduct was sanctioned by the 'rules of the game.'" *Som Maior Audio E Video, Ltda. v. Creston Elecs., Inc.*, Civ. No. 20-19864, 2021 WL 5770259, at *4 (D.N.J. Dec. 3, 2021) (quoting *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001)). For instance, acts of interference involving "violence, fraud, intimidation, misrepresentation, criminal or civil threats, and/or violations of the law" constitute malice. *Nostrame*, 61 A.3d at 902 (internal citations and quotations omitted).

Here, Plaintiffs do not sufficiently plead that Defendants acted intentionally or with malice. Plaintiffs plead only conclusory allegations that "Defendants knew or had reason to know of those agreements" and "Defendants intentionally interfered with those agreements with malice." (ECF No. 1 ¶¶ 79-80.) Indeed, merely reciting the elements of a tortious inference claim without supporting facts or evidence of intentionality or malice is insufficient to sustain Plaintiffs' claim. *See Som Maior Audio E Video*, 2021 WL 5770259, at *5 (noting that allegations "that parrot the tortious interference legal standard are insufficient"). Accordingly, Plaintiffs' tortious inference claim in Count Three is dismissed.

### D.   CONVERSION AND TRESPASS TO CHATTELS (COUNTS FOUR AND FIVE)

Counts Four and Five include alternative companion tort claims of conversion and trespass to chattels.  (ECF No. 1 ¶¶ 82-85 (Count Four), ¶¶ 86-89 (Count Five).)

#### 1.   CONVERSION

Plaintiffs allege that Defendants unlawfully converted Plaintiffs' shares of the Baron Funds purchased on June 12, 2020, by "taking back those shares after the settlement date" of June 15, 2020, and "failing to pay the full value of the securities as of the next calculated NAV [net asset value] following such redemptions as required by federal law."  (ECF No. 1 ¶¶ 82-85.)

The elements of a conversion claim are "(1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant."  *Adami v. Cardo Windows, Inc.*, Civ. No. 12-2804, 2014 WL 2586933, at *15 (D.N.J. June 10, 2014).  "The theory behind conversion is that the actor has exerted such a major and serious interference with the plaintiff's rights to the chattel that in essence the law will force a judicial sale of the chattel upon the defendant."  *LaPlace v. Briere*, 962 A.2d 1139, 1145 (N.J. Super. Ct. App. Div. 2009) (citations omitted).  Although this cause of action originally was "intended to protect title to chattels," conversion has been applied to other forms of property, such as "money, bonds, promissory notes, and other types of securities, as long as the plaintiff has an actual interest in the security, and it is capable of misuse in a way that would deprive the plaintiff of its benefit."  *Cargill Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 578 (D.N.J. 2010).  Such application has been restricted in New Jersey, however, to prevent breach-of-contract claims from turning into tort claims.  *Id.*

Plaintiffs have not sufficiently alleged that they had "an actual interest in the security."  In their opposition papers, Plaintiffs assert that the converted property is the "shares acquired on June 12, 2020—not '$1.5 million in value' that those shares 'would have accrued.'"  (ECF No. 26 at

19.)  For their assertion, however, Plaintiffs cite to allegations of the Complaint that generally describe the trades but do not specifically identify or quantify the shares traded.  (*See id.*; ECF No. 1 ¶¶ 50-55, 83.)  A review of these allegations makes clear that Plaintiffs demand not the identical funds or shares that Defendants allegedly converted, but any money for "damages of at least approximately $1.5 million" or "at least $359,176.94."  (ECF No. 1 ¶ 85.)[10]  *See Cargill Glob. Trading*, 706 F. Supp. 2d at 578 ("Only where there is an obligation to return 'the identical money' will an action for conversion lie . . . ." (citations omitted)).

In addition, the Complaint does not include sufficient facts supporting the allegation that Defendants acted "wrongfully" in reversing Plaintiffs' June 12 Trade for violating the Frequent Trading Policy.  As with Plaintiffs' breach-of-contract claim, Plaintiffs have not sufficiently pled that Defendants' actions were inconsistent with or in breach of the Frequent Trading Policy.  *See Cargill Glob. Trading*, 706 F. Supp. 2d at 578-79 (ruling that plaintiff failed to state a conversion claim where defendant "did nothing legally wrong" in "exercise[ing] its express contractual authority to override the prepayment restrictions"); *see also Fagan v. Fischer*, Civ. No. 14-7013, 2019 WL 5587286, at *18 (D.N.J. Oct. 30, 2019) (dismissing conversion claim based in part on defendants' failure to pay plaintiff dividends); *Premio Foods, Inc. v. Purdue Farms, Inc.*, Civ. No. 11-4968, 2012 WL 3133791, at *6 (D.N.J. July 30, 2012) (dismissing conversion claim related to

---

[10]    That Plaintiffs calculate this $1.5 million amount as "the NAV of the funds next calculated 90 days after the settlement of the trades *less the purchase price*" (ECF No. 1 ¶ 85 (emphasis added)) bolsters the notion that Plaintiffs are misusing a conversion claim to recover profits.  *See Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) ("[P]laintiff can recover the value of converted property and interest but cannot recover lost profits." (citing *Foley Mach. Co. v. Amland Contractors, Inc.*, 506 A.2d 1263, 1268 (N.J. Super. Ct. App. Div. 1986))). Also telling is that Plaintiffs seek the same damages for their breach-of-contract claim as they do for their conversion claim. (*See* ECF No. 1 ¶¶ 71, 85.)  *See Dougherty v. Drew Univ.*, 534 F. Supp. 3d 363, 380 (D.N.J. 2021) ("A claim for conversion thus must be distinguished from a debt, or a claim that one is owed money as the result of a breach of contract." (citations omitted)).

trade secrets where plaintiff did not allege defendants' possession of tangible property).  Thus, Plaintiffs' conversion claim cannot survive Defendants' motion.

### 2.   TRESPASS TO CHATTELS

In the alternative, Plaintiffs assert a claim for trespass to chattels.  (ECF No. 1 ¶¶ 86-89.) Plaintiffs allege that even if they were not entitled to the shares purchased on June 12, 2020, they had a right to the original purchase price that they paid to invest in the Baron Funds on June 12, 2020.  (*Id.* ¶ 87.)

A cognizable claim for trespass to chattels arises "when personal property, in the actual use of the owner, is injured or taken by a trespasser, so that the owner is deprived of the use of it." *Luse v. Jones*, 39 N.J.L 707 (N.J. 1877); *see Barrett Fin. of N. Jersey, LLC v. Creative Fin. Grp. of New Jersey*, Civ. No. 13-5621, 2018 WL 3546196, at *8 n.9 (D.N.J. July 24, 2018) ("A trespass to chattel may be committed by 'intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another.'" (quoting *Exxonmobil Oil Corp. v. Wakile & Sons, Inc.*, Civ. No. 09-01265, 2009 WL 3818151, at *3 (D.N.J. Nov. 13, 2009))).  Case law in New Jersey relating to claims for trespass to chattels is sparce.  *See Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 312 (D.N.J. 2009).  Unlike with conversion claims, "New Jersey courts have not squarely addressed whether the tort of trespass to chattels can apply to intangible property that has been wrongfully possessed or used." *Barrett Fin.*, 2018 WL 3546196, at *11. Courts in this District have adopted the Restatement (Second) of Torts, which dictates that, "like conversion, trespass to chattels requires tangible personal property over which one can have physical control." *Id.*; *see iPurusa, LLC v. Bank of New York Mellon Corp.*, Civ. No. 22-966, 2023 WL 3072686, at *10 (D.N.J. Apr. 25, 2023) ("[L]ike conversion, trespass to chattels requires tangible personal property." (quoting *Barrett Fin.*, 2018 WL 3546196, at *11)); *see also Knox v. Samsung Elecs. Am., Inc.*, Civ. No. 08-4308, 2009 WL 1810728, at *8 (D.N.J. June 25, 2009)

("Assuming *arguendo* that New Jersey recognizes the tort of trespass to chattels via the Restatement . . . ."). In *iPurusa*, the Court dismissed a trespass-to-chattels claim arising from defendants' allegedly intentional intermeddling with a software application that belonged to plaintiff, reasoning that the software application was not tangible property, and "to the extent it was embodied in [defendant]'s computer systems, such systems do not belong to Plaintiff." 2023 WL 3072686, at *10.

Here, Plaintiffs' trespass-to-chattels claim concerns the money that Plaintiffs paid for shares. (*See* ECF No. 1 ¶ 88 ("Baron interfered with Plaintiffs' right to possess the *money* paid to invest in the Baron [F]unds.") (emphasis added).) New Jersey courts have not addressed the specific issue whether money, paid in exchange for shares of mutual funds, constitutes a type of actionable "chattel." Defendants cite a single case out of the Southern District of New York, which dismissed a trespass-to-chattels claim under New York law on the grounds that "[m]oney is fungible and not properly characterized as a 'chattel.'" *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 259 (S.D.N.Y. 2012). Two years after *Chevron*, however, the same district court rejected the broad proposition that "funds do not constitute 'chattel,'" noting that the *Chevron* court acknowledged that "a claim based on interference with funds could lie where the funds 'can be described, identified, or segregated in the manner that a specific chattel can be and when [they are] subject to an obligation to be returned.'" *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 283 (S.D.N.Y. 2014) (quoting *Chevron*, 871 F. Supp. 2d at 259 n.172); *but see Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 660 (N.J. 2020) (noting conversion "[t]raditionally applie[s] to chattels" but can apply to money under certain provisions).

There are several reasons why Plaintiffs have not stated a claim for trespass to chattels. For starters, Plaintiffs' allegations do not make clear who possessed or had the right to possess, within the meaning of the claim, the funds at the time that Defendants reversed the trades — a key

part of asserting a trespass-to-chattels claim.  *See* Restatement (Second) of Torts § 216 (defining "possession of a chattel").  As in *iPurusa*, the present allegations do not indicate that Plaintiffs were in possession of the funds at the time that Defendants reversed the trades, or that Defendants reversed the trades on a platform that belonged to Plaintiffs.  If actionable dispossession, use, or intermeddling occurred another way, it is incumbent upon Plaintiffs to allege so sufficiently in the complaint.  For another, having discovered no precedent of applying New Jersey law to include money as a type of actionable chattel, the Court is not inclined to make such expansion on Plaintiffs' allegations.  And even if the Court were so inclined, and opted to follow *Chevron* and its progeny, Plaintiffs still would not have satisfied the requirement that the money be "described, identified, or segregated."  (*See* § III.D.1 above.)

Accordingly, the Court grants Defendants' motion to dismiss as to Plaintiffs' trespass-to-chattels claim.  *See Barrett Fin.*, 2018 WL 3546196, at *11 (dismissing a trespass to chattels claim based on personal data files).  Count Five is therefore dismissed.

### E.    NEGLIGENT MISREPRESENTATION (COUNT SIX)

Plaintiffs claim that Zorovich negligently misrepresented that "Plaintiffs would be permitted to trade in and out of Baron [F]unds without penalty in response to the market volatility caused by the COVID-19 pandemic."  (ECF No. 1 ¶¶ 90-95.)  Plaintiffs allege that, in reliance on this alleged misrepresentation, "Plaintiffs executed trades that Baron deemed in violation of the frequent-trading policy."  (*Id.* ¶ 93.)

"A cause of action for negligent misrepresentation may exist when a party negligently provides false information."  *Karu v. Feldman*, 574 A.2d 420, 425 (N.J. 1990).  To establish a *prima facie* case of negligent misrepresentation, Plaintiffs must show the following elements: "(1) an incorrect statement, (2) negligently made, (3) upon which [Plaintiffs] justifiably relied, and (4) resulted in economic loss or injury as a consequence of that reliance."  *Mason v. Coca-Cola Co.*,

774 F. Supp. 2d 699, 704 (D.N.J. 2011) (citing *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 142-43 (N.J. 1983)).

Here, the alleged misrepresentation was made in connection with an inquiry "[t]owards the end of March 2020" from Plaintiffs' broker "to confirm that Plaintiffs would be able to *reinvest* in [the] Baron [F]unds without penalty," as Plaintiffs had traded out of the Baron Funds on February 25, 2020. (ECF No. 1 ¶¶ 23, 42 (emphasis added).) The misrepresentation, according to Plaintiffs, was Zorovich's response that "the trades would be allowed because Plaintiffs had a legitimate rationale behind the short-term trading—to mitigate losses triggered by the pandemic-related market volatility."[11]  (*Id.* ¶ 42.)  And so, on March 26, 2020, Plaintiffs repurchased one Baron Fund.  (*Id.* ¶ 44.)

Defendants argue that Plaintiffs' claim fails on the first element, because Zorovich's statement "was entirely true," given that (1) "Plaintiffs were permitted to reinvest in the Baron Funds in March 2020 without penalty," and (2) "those trades did not violate the Frequent Trading Policy."  (ECF No. 17-1 at 31; ECF No. 27 at 12; *see* ECF No. 1 ¶¶ 42-44, 91.)  The Court agrees. Defendants' policy concerns "[t]rades in and out of a Fund within 90 days or less . . . ."  (ECF No. 17-2 at 95; ECF No. 1 ¶ 28.)  By March 2020, the time of the alleged misrepresentation, Plaintiffs had not traded in a way that would constitute "frequent trading" under the policy.  They had purchased their first shares in September 2019, purchased more shares in January 2020, and sold

---

[11]    Although Defendants also challenged another statement as a potentially alleged misrepresentation — Zorovich's comment that Plaintiffs' late-April purchases were a "great trade" (ECF No. 17-1 at 31; ECF No. ¶ 47) — Plaintiffs did not clearly visit this specific comment as support for their negligent-misrepresentation claim (*see generally* ECF No. 26 at 20-23; ECF No. 1 ¶¶ 90-95).  So, the Court need not address it.  *See Powell v. Verizon*, Civ. No. 19-8418, 2019 WL 4597575, at *9 (D.N.J. Sept. 20, 2019) ("A plaintiff concedes a claim when she fails to oppose arguments in support of a motion to dismiss it under Fed. R. Civ. P. 12(b)(6)." (citations omitted)).

all of their shares in February 2020 — a span of 155 days.  (ECF No. 1 ¶¶ 19-20, 23.)  Thus, Plaintiffs' trading *into* a Baron Fund would not run counter to the policy.[12]

Accordingly, the Court grants Defendants' motion as to Plaintiffs' claim for negligent misrepresentation and dismisses Count Six.

### F.   EQUITABLE ESTOPPEL (COUNT SEVEN)

Plaintiffs assert that Defendants should be estopped from banning Plaintiffs from trading in the Baron Funds, because Plaintiffs "justifiably relied, to their injury and detriment, upon the material representations of Defendants, which indicated that Defendants would allow Plaintiffs' transactions in the [Baron Funds]."  (ECF No. 1 ¶¶ 96-98.)

The equitable-estoppel doctrine requires the claiming party to show (1) a misrepresentation of material fact, known to the party sought to be estopped but unknown to the other, (2) made with the intention or expectation that it will be relied upon, (3) and upon which the availing party reasonably relied, (4) to their detriment.  *Quigley, Inc. v. Miller Fam. Farms, Inc.*, 629 A.2d 110, 117 (N.J. Super. Ct. App. Div. 1993).  The doctrine "is applied only in very compelling circumstances . . . where the interests of justice, morality and common fairness clearly dictate that course."  *Davin, L.L.C. v. Daham*, 746 A.2d 1034, 1040 (N.J. Super. Ct. App. Div. 2000) (citing *Palatine I v. Plan. Bd. of Montville*, 628 A.2d 321, 328 (N.J. 1993)).[13]

---

[12]     Plaintiffs also fail to plead a duty independent of the existence of any contract between the parties.  New Jersey courts "will uphold a negligent misrepresentation claim alongside a contract claim where an independent duty exists."  *Montclair State Univ. v. Oracle USA, Inc.*, Civ. No. 11-2867, 2012 WL 3647427, at *11 (D.N.J. Aug. 23, 2012) (citing *Karu*, 574 A.2d at 427).  Without pointing to any such independent duty, Plaintiffs cannot sustain a negligent-misrepresentation claim.  *See Int'l Mins. & Min. Corp. v. Citicorp N. Am., Inc.*, 736 F. Supp. 587, 597 (D.N.J. 1990) ("It has long been the law that remedies in tort relating to a breach of contract may not be maintained in addition to those established under the contract itself in the absence of any independent duty owed by the breaching party to the plaintiff.").

[13]     The parties cite case law that appears to conflict as to whether New Jersey courts recognize a claim of equitable estoppel as an independent cause of action.  *Compare Gant v. Ragone*, Civ.

Plaintiffs specify that Zorovich's March 2020 statement forms the basis of their equitable-estoppel claim.  (ECF No. 26 at 24.)  Thus, as with their negligent-misrepresentation claim, Plaintiffs have not shown a misrepresentation of material fact needed to establish an equitable-estoppel claim.  (*See* § III.E above.)  In addition, because Plaintiffs, by their own allegations, were permitted to trade into the Baron Funds without penalty in March 2020, Plaintiffs have not shown that they acted to their detriment in reliance on Zorovich's March 2020 statement.  The Court also finds persuasive Defendants' argument — which Plaintiffs did not address — that "Plaintiffs do not claim that Zorovich's statements induced their," in Plaintiffs' words, "unsolicited" June 12 purchases.  (ECF No. 17-1 at 33; *see* ECF No. 1 ¶ 50 (alleging that Plaintiffs "purchase[d] unsolicited the same [Baron Funds] that Plaintiffs previously held").)  Minding these pleading deficiencies, the Court cannot find that Plaintiffs have alleged facts of "very compelling circumstances" such that "the interests of justice, morality and common fairness" justify survival of this claim.  *See Facteon, Inc. v. Comp Care Partners, LLC*, Civ. No. 13-6765, 2014 WL 6685380, at *7 (D.N.J. Nov. 26, 2014) (dismissing equitable-estoppel claim for pleading deficiencies).

Thus, Plaintiffs' claim for equitable estoppel in Count Seven of the Complaint is dismissed without prejudice.

### G.    UNJUST ENRICHMENT (COUNT EIGHT)

The Complaint alleges that Defendants were unjustly enriched by retaining the full value of Plaintiffs' securities — that is, the "earned income on [Plaintiffs'] shares in [Baron Funds]" —

---

No. 20-01727, 2020 WL 6797125, at *9 (D.N.J. Nov. 19, 2020) ("Because there is no separate cause of action for equitable estoppel, the motion to dismiss the equitable estoppel claim is [granted]."), *with Phillips v. Borough of Keyport*, 107 F.3d 164, 182 (3d Cir. 1997) (describing how "[t]o establish a claim of equitable estoppel . . . ." under the "well[-]established" doctrine in New Jersey).  The Court addresses Plaintiffs' claim without resolving this conflict — if one exists at all.

or, if Plaintiffs' trades had not yet settled, "retaining Plaintiffs' money to their detriment for several weeks as the funds appreciated in value."  (ECF No. ¶¶ 100-102.)

"To establish a claim of unjust enrichment in New Jersey, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 723 (N.J. 2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994)).  For this claim, a plaintiff must "show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  *Hughes v. Panasonic Consumer Elecs. Co.*, Civ. No. 10-846, 2011 WL 2976839, at *26 (D.N.J. July 21, 2011) (quoting *VRG Corp.*, 641 A.2d at 526).  In addition, "a claim for unjust enrichment requires a direct relationship between the parties." *Hammer v. Vital Pharms., Inc.*, Civ. No. 11-4124, 2012 WL 1018842, at *10 (D.N.J. Mar. 26, 2012) (citations omitted); *Bedi v. BMW of N. Am., LLC*, Civ. No. 15-1898, 2016 WL 324950, at *5 (D.N.J. Jan. 27, 2016) ("[T]here must be a direct relationship to assert an unjust enrichment claim.").  "[I]t is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim." *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 496 (D.N.J. 1998).

Critical here, "the equitable remedy of unjust enrichment is not available when there is a valid contract" between the parties. *Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.*, Civ. No. 06-4449, 2009 WL 900758, at *7 (D.N.J. Mar. 31, 2009) (citing *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982)).  Although a plaintiff may not recover on both a breach-of-contract claim and an unjust-enrichment claim, a plaintiff may plead alternative and inconsistent legal causes of action arising out of the same facts. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones"), (3) ("A party may state as many separate claims or defenses

as it has, regardless of consistency"); *see also Shankman v. State*, 876 A.2d 269, 280 (N.J. 2005) ("[I]t is well settled that that plaintiff may plead alternative or inconsistent claims." (citing N.J. Ct. R. 4:5-6)).   At the motion-to-dismiss stage, "pleading both breach of contract and unjust enrichment is plausible only when the validity of the contract itself is actually disputed, making unjust enrichment a potentially available remedy." *Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 n.8 (3d Cir. 2014) (citations omitted).

Although Plaintiffs are correct that they "are entitled to assert claims in the alternative" (ECF No. 26 at 26), they have fallen short of pleading their unjust-enrichment claim precisely as an alternative to their breach-of-contract claim (*compare* ECF No. 1 ¶ 87 (alleging trespass-to-chattels claim "solely as an alternative claim"), *with id.* ¶¶ 99-103 (alleging unjust-enrichment claim without specifying as alternative theory)).   To be properly pled alongside a breach-of-contract claim, an unjust-enrichment claim must acknowledge that it is viable only if it is not covered by a valid, enforceable contractual obligation.   *See Nan, Inc. v. Wood Env't & Infrastructure Sols., Inc.*, Civ. No. 21-707, 2022 WL 317084, at *4 (D.N.J. Feb. 2, 2022) (noting unjust-enrichment claims flow from disputed validity of underlying contract).

Defendants also argue that Plaintiffs did not have a direct relationship with Defendants, as Plaintiffs conducted each of their trades of Baron Funds through a broker.   (*See, e.g.*, ECF No. 1 ¶ 3 ("Plaintiffs' broker placed the trades"), ¶ 50 ("[Plaintiffs] instructed the broker to reenter the market . . . on June 12, 2020").)   Because "[t]his cause of action sounds in contract, not tort, . . . there must be a direct relationship between the parties." *Bedi*, 2016 WL 324950, at *5; *see Hughes*, 2011 WL 2976839, at *27 ("[I]f a plaintiff purchases a product from a third party retailer, rather than the defendant, then no direct relationship exists where the plaintiff purchaser conferred a benefit on the defendant.").   Plaintiffs counter that Defendants rely on inapposite cases where plaintiffs purchased goods from retailers and then sued manufacturers for unjust enrichment.   (ECF

No. 26 at 26.)  But Plaintiffs do not provide any authority supporting the proposition that investors acting through a broker have a sufficiently direct relationship with the fund manager.  If such authorities exist, it was incumbent upon Plaintiffs to bring them to the Court's attention.

The Court therefore grants Defendants' motion as to Plaintiffs' unjust-enrichment claim and dismisses Count Eight.

### H.    SPOLIATION (COUNT TEN)

Count Ten presents a claim for spoliation based on the allegation that "Defendants altered or modified book entries and other records relating to the settlement of Plaintiffs' trades in Baron shares in an effort to show inaccurately that those trades did not settle but were instead canceled or rejected."  (ECF No. 1 ¶¶ 107-110.)

New Jersey does not recognize a separate tort for either intentional spoliation or negligent spoliation of evidence.  *See Nype v. Spitz*, Civ. No. 20-13680, 2022 WL 329321, at *5 (D.N.J. Feb. 3, 2022) ("New Jersey does not recognize an independent tort for intentional spoliation." (citing *Rosenblit v. Zimmerman*, 766 A.2d 749, 757 (N.J. 2001))); *Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1191 n.6 (N.J. 2008) ("[W]e have not in the past recognized, and we do not now recognize, any separate tort for negligent spoliation.").[14]  Rather, "intentional spoliation is properly recognized under the tort of fraudulent concealment."  *Nype*, 2022 WL 329321, at *5 (quoting *Rosenblit*, 766 A.2d at 758).  To plead spoliation under fraudulent concealment, Plaintiffs must allege the following:

> (1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;
> (2) That the evidence was material to the litigation;
> (3) That plaintiff could not reasonably have obtained access to the evidence from another source;

---

[14]    Although the Complaint does not specify which spoliation claim it alleges, the Court presumes the Complaint brings a claim for intentional spoliation.  (*See* ECF No. 1 ¶ 108 ("Defendants *intentionally* altered or destroyed information.") (emphasis added).)

(4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;
(5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

[*Rosenblit*, 766 A.2d at 758.]

Plaintiffs must also satisfy the heightened pleading requirements of Rule 9(b).  *Powell v. Seton Hall Univ.*, Civ. No. 21-13709, 2022 WL 1224959, at *6 (D.N.J. Apr. 26, 2022) (citing *Weske v. Samsung Elecs. Am., Inc.*, Civ. No. 10-4811, 2012 WL 833003, at *5 (D.N.J. Mar. 12, 2012)).  "Rule 9(b) essentially requires [p]laintiffs to allege the who, what, when, where, and how elements to state a claim arising in fraud."  *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 703 (D.N.J. 2013).

Here, Plaintiffs do not plead each of the elements of a fraudulent-concealment claim.  For starters, the Complaint includes no allegations addressing whether Plaintiffs could have reasonably obtained access to the records from another source.  Nor does the Complaint include specific allegations as to the intent or knowledge of Defendants in engaging in the alleged misconduct.  And Plaintiffs have not met the heightened particularity requirements under Rule 9(b), as the Complaint fails to offer with any particularity facts that Defendants engaged in the alteration or modification of records.  Thus, Plaintiffs have failed to state a claim for spoliation under fraudulent concealment.  Count Ten is dismissed without prejudice.

## I.   DECLARATORY JUDGMENT (COUNT NINE)

Finally, Plaintiffs' remaining claim seeks a declaratory judgment, under 28 U.S.C. § 2201, that "(i) Plaintiffs had an entitlement to the securities purchased on June 12, 2020; (ii) Defendants had no lawful right to reverse Plaintiffs' settled trades; (iii) Defendants were required to calculate the NAV for the involuntary redemption of Plaintiffs' securities at the next calculated NAV

following such redemption orders as required by federal law; and (iv) Defendants had no lawful right to permanently ban Plaintiffs from trading in [the] Baron [F]unds."  (ECF No. 1 ¶¶ 104-106.)

The Declaratory Judgment Act provides that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  Declaratory judgments are discretionary, "inappropriate solely to adjudicate past conduct," and not "meant simply to proclaim that one party is liable to another."  *Meyer v. Del. Valley Lift Truck, Inc.*, 392 F. Supp. 3d 483, 493 (E.D. Pa. 2019) (quoting *Warren v. Lehigh Cnty. Ct. of Common Pleas*, 351 F. Supp. 3d 835, 839 (E.D. Pa. 2019)).

Here, Plaintiffs ask for a declaratory judgment as to legal questions that pertain solely to "past conduct."  *See Meyer*, 392 F. Supp. 3d at 494.  Specifically, Plaintiffs focus on "whether Defendants had a right to reverse Plaintiffs' settled trades and impose a lifetime ban on Plaintiffs' trading in Baron mutual funds."  (ECF No. 1 ¶ 105.)  Such actions were all past conduct and, therefore, are not appropriately resolved through a declaratory judgment.  In addition, an independent claim for declaratory judgment, on its own, is "simply not a claim."  *Muhlbaier v. Specialized Loan Servicing LLC*, Civ. No. 18-00125, 2018 WL 3238832, at *3 (D.N.J. July 3, 2018).  Courts routinely dismiss declaratory judgment counts that provide no "substantive basis for relief."  *See, e.g.*, *In re AZEK Bldg. Prod., Inc., Mktg. & Sales Pracs. Litig.*, 82 F. Supp. 3d 608, 625 (D.N.J. 2015) (collecting cases).

Because Plaintiffs claim for declaratory judgment is the only remaining cause of action, the Court grants Defendants' motion to dismiss Count Nine of the Complaint.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court **GRANTS** Defendants' Motion to Dismiss (ECF No. 17) in its entirety.  Plaintiffs' Complaint (ECF No. 1) is **DISMISSED** without prejudice.  To the extent that Plaintiffs believe they can cure the deficiencies in their complaint, Plaintiffs are

given leave to amend within 30 days after the date of the accompanying Order.  An appropriate

Order follows.


Dated: August 31, 2023                                              *s/ Georgette Castner*
                                                                    **GEORGETTE CASTNER**
                                                                    **UNITED STATES DISTRICT JUDGE**